**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
JENNIFER DONOHUE, individually and as the
Administratrix of the Estate of Scott Donohue,

                           Plaintiffs,

        -against-

JOSEPH WING, MICHAEL MCGOWAN,
individually and in their official capacity, and
THE VILLAGE OF HEMPSTEAD,

                           Defendants.
-------------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**

CV 17-3870 (JMA) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     P̲R̲E̲L̲I̲M̲I̲N̲A̲R̲Y̲ ̲S̲T̲A̲T̲E̲M̲E̲N̲T̲

This case arises out of the tragic death of Scott Donohue, a lieutenant with the Village of

Hempstead Police Department who took his own life on September 12, 2016. *See generally*

Complaint ("Compl.") [DE 1]. Scott Donohue ("Lieut. Donohue") is survived by his wife,

Jennifer Donohue ("Mrs. Donohue") who has brought the instant action under 42 U.S.C. § 1983

in her individual capacity and as the administratrix of the Estate of Lieut. Donohue (collectively,

"Plaintiffs"). The Complaint alleges that the Village of Hempstead, along with Joseph Wing and

Michael McGowan, in their individual and official capacities (collectively, "Defendants"),

violated Lieut. Donohue's Fourteenth Amendment substantive due process rights by failing to

take appropriate action to prevent his suicide. Mrs. Donohue also asserts, in her own right, a

substantive due process/intimate association claim. Defendants have moved to dismiss the

Complaint, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Judge Azrack

referred Defendants' motion to dismiss to this Court for a Report and Recommendation as to

whether the motion should be granted.  Having carefully reviewed Plaintiffs' Complaint, the motion papers and the applicable case law, this Court respectfully recommends to Judge Azrack that Defendants' motion to dismiss be GRANTED.

## II.   BACKGROUND

### A.  Complaint

The following facts are taken from the Complaint.  *See generally* Compl.  All facts alleged by Plaintiffs are assumed to be true for purposes of deciding a motion to dismiss and are construed in a light most favorable to Plaintiffs as the non-moving parties.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009); *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 425 (E.D.N.Y. 2012).

#### 1.   *Lieut. Donohue's Employment with the Village of Hempstead Police Department*

Lieut. Donohue commenced employment with the Village of Hempstead Police Department ("VHPD") in March 1993 as a police officer.  Compl. ¶ 43.  He was promoted to the rank of Sergeant in February 2000 and then to Lieutenant in October 2003.  *Id*. ¶¶ 44-45.  "Throughout this time, Lieut. Donohue performed his job responsibilities in an exemplary manner."  *Id*. ¶ 47.  While on duty on July 25, 2009, Lieut. Donohue was involved in a motor vehicle accident.  *Id*. ¶ 48.  As a result, he sustained injuries to his neck, back and left shoulder. *Id*.  Lieut. Donohue was transported to Winthrop University Hospital where he was diagnosed with a mild concussion.  *Id*. ¶ 50.  After returning home, he complained to Mrs. Donohue that his head hurt, that he could not sleep and that the light was bothering him.  *Id*. ¶ 52.  Mrs. Donohue took Lieut. Donohue to St. Charles Hospital for further evaluation.  *Id*. ¶ 53.  The staff at St. Charles confirmed the diagnosis of mild conclusion and referred Lieut. Donohue to a

neurologist. *Id.* ¶ 54. Lieut. Donohue advised his supervisors at VHPD that he could not immediately return to work due to his symptoms. *Id.* ¶ 55.

## 2. *VHPD Sick Leave and Light Duty Policies*

VHPD enforces a "restriction to residence" policy for officers who cannot report for work due to an illness or an injury. *Id.* ¶ 56. Pursuant to the policy, officers are required to remain at their residence unless the VHPD chief grants them an exemption which permits them to leave their residence outside of the 9 a.m. to 5 p.m. workday. *Id.* ¶¶ 56-57. The VHPD generally offers "light duty" positions to those officers who are medically limited and cannot perform full-duty functions. *Id.* ¶ 60. "Light duty" positions are not offered to officers who are permanently injured. *Id.* ¶ 61.

Lieut. Donohue was placed on sick leave as a result of the injuries he suffered during the motor vehicle accident on July 25, 2009. *Id.* ¶ 63. He was then subject to VHPD's restriction to residence policy. *Id.* Lieut. Donohue followed up with a neurologist as well as Dr. Donald Goldman, an orthopedic surgeon who evaluated and treated Lieut. Donohue for pain management. *Id.* ¶ 65. Lieut. Donohue's pain increased over the next several months -- he suffered from pain in his lower back and neck and experienced difficulty raising his left arm above his head. *Id.* ¶¶ 66-67. As a consequence, he was unable to return to work and continued to be subject to VHPD's restriction to residence policy. *Id.* ¶ 68. On October 31, 2009, Lieut. Donohue underwent an MRI which revealed that he suffered from a "disc herniation resulting in spinal canal stenosis and compression of the spinal cord." *Id.* ¶ 69. He informed VHPD of the diagnosis and continued to remain out of work. *Id.* ¶ 70. Plaintiffs allege that due to VHPD's policy of not offering light duty positions to officers injured in the line of duty -- and given the extent of Lieut. Donohue 's injuries -- he was unable to return to work. *Id.* ¶ 71. He decided to

apply for disability retirement under the New York state retirement system. *Id.* ¶ 74. According to the Complaint, on October 10, 2011, Independent Medical Examiner Dr. Moriarty told the New York State and Local Retirement System that "'[Lieut. Donohue] could work in a modified duty capacity wherein lifting, pushing, and pulling greater than 35 pounds is avoided. [Lieut. Donohue] would have no other restrictions at this time.'" *Id.* ¶ 78. Dr. Moriarty subsequently advised the Retirement System that Lieut. Donohue could work in a full-time position in the "communications area or as a police officer in the clerk area." *Id.* ¶ 79. Plaintiffs allege that VHPD did not offer Lieut. Donohue any such position. *Id.* ¶ 80.

New York State denied Lieut. Donohue's disability retirement application on October 23, 2012. *Id.* ¶ 81. On June 19, 2014, Dr. Moriarty determined that:

> [Lieut. Donohue] was noted to have a mild partial degree of disability. It was indicated [Lieut. Donohue] could work in a modified duty capacity with weight handling restrictions to 25 pounds and would have restriction on repetitive bending and repetitive lifting. Based on this evaluation [Lieut. Donohue] would be unable to work unrestricted full duty. He could work full time in a modified duty position with restrictions noted above.

*Id.* ¶ 86. According to the Complaint, the VHPD still did not provide Lieut. Donohue with a light duty position. *Id.* ¶ 88. In July 2014, Police Chief Michael McGowan ordered Lieut. Donohue to report to work on July 14, 2014. *Id.* ¶ 89. Lieut. Donohue provided Chief McGowan with information regarding his condition and McGowan responded that Lieut. Donohue need not report to work as previously directed. *Id.* ¶¶ 90-91.

On October 2, 2014, Lieut. Donohue underwent an "Anterior Cervical Discectomy and Fusion" which, according to the Complaint, is a surgical procedure which treats nerve root or spinal cord damage. *Id.* ¶ 92. After the surgery, Lieut. Donohue continued to suffer from neck

and shoulder pain, numbness in his thumb to middle finger, neck stiffness, weakness in both hands, and "clicking" in his neck. *Id.* ¶ 93-94.

"'As of February 25, 2016, Lieut. Donohue's treating physician had determined that he 'reached maximal medical improvement' and that his injuries rendered him 'unable to make a forcible arrest or defend himself' and he was 'unable to safeguard his firearm should someone try to take it from him forcibly.'" *Id.* ¶ 97. In April 2016, Lieut. Donohue was again denied disability retirement by New York State. *Id.* ¶ 98. According to the Complaint, although Lieut. Donohue could have retired under a regular retirement plan, doing so would have denied him the substantial benefits available under the disability retirement plan, which Lieut. Donohue required to be able to support his family. *Id.* ¶102.

As of April 2016, Lieut. Donohue had been confined to his home during the workweek for close to seven years. *Id.* ¶ 105. Plaintiffs allege that VHPD failed to offer assistance to Lieut. Donohue to help deal with his situation or his mental health. *Id.* ¶ 105. He began exhibiting changes in his behavior after the last denial of his retirement application in April 2016. *Id.* ¶ 106. Mrs. Donohue noticed that his anger increased and he would "lament about his inability to be a productive member of the community, to perform the duties of the job he loved, and his confinement to his home for such an extended period of time." *Id.* ¶ 108.

Lieut. Donohue and Mrs. Donohue went to the VHPD and pleaded with Assistant Chief Joe Sortino to assist Lieut. Donohue. *Id.* ¶¶ 110-11. According to the Complaint, Sortino noted that Lieut. Donohue had lost a lot of weight. *Id.* ¶ 112. Sortino advised that VHPD could not do anything to assist him. *Id.* ¶ 115. As Lieut. Donohue and Mrs. Donohue left the meeting, they saw Chief McGowan, and Lieut. Donohue pleaded with him to help him. *Id.* ¶¶ 116-17. Although Chief McGowan indicated that he would make a call to the retirement system, he had

no control over the process. *Id.* ¶ 118. Plaintiffs allege that "McGowan took no action to help Lieut. Donohue emotionally or to discuss with him what other options or accommodations could be made…." *Id.* ¶ 119. According to the Complaint, Lieut. Donohue's pleas were out of character as he was the type of person "who was reluctant to ask others for help." *Id.* ¶ 120. Plaintiffs assert that it should have been obvious to Sortino, McGowan and other VHPD employees that Lieut. Donohue needed emotional help. *Id.* ¶ 121.

Mrs. Donohue begged her husband to seek mental health treatment but he responded that he could not do so out of fear that the VHPD would find out. *Id.* ¶¶ 124-25. In July 2016, Lieut. Donohue agreed to seek treatment through the Employee Assistance Program ("EAP") offered by Mrs. Donohue's employer. *Id.* ¶ 126. He attended the three sessions for which the program allowed. *Id.* ¶ 127. At the conclusion of the third session, EAP referred Lieut. Donohue to a private therapist. *Id.* ¶ 128. Lieut. Donohue told his wife that he would not seek treatment from a private therapist because it would have to be billed through his VHPD insurance plan and he could not risk VHPD discovering that he was receiving mental health treatment. *Id.* ¶ 129.

Lieut. Donohue's daughter had her first cheerleading event at her school on September 11, 2016. *Id.* ¶ 130. Since he was still subjected to the restriction to residence requirement, however, Lieut. Donohue could not attend. *Id.* ¶ 131. Lieut. Donohue left his home later that night and called his wife, explaining that "he felt he 'wasn't right,' that he was in pain, and that no one believed him." *Id.* ¶ 132. He also lamented being unable to attend his children's events. *Id.* ¶ 133. Lieut. Donohue returned home later that night "hugged and kissed his children, and told [Mrs.] Donohue that he could not go on living under these conditions anymore." *Id.* ¶ 134. She tried to console him. *Id.* ¶ 135. According to the Complaint, Lieut. Donohue told his wife that he could not sleep and that he was going downstairs to watch

television. *Id.* ¶ 136. The next morning, Mrs. Donohue could not find her husband anywhere in their home. *Id.* ¶ 138. She contacted the Suffolk County Police to help search for him. *Id.* ¶ 139. The police responded "with K-9 units and a helicopter" to conduct a search. *Id.* ¶ 140. Lieut. Donohue was found not far from his home. *Id.* ¶ 140. He had taken his life that day, September 12, 2016. *Id.* ¶ 141.

Based on these allegations, Plaintiffs bring two causes of action against the Defendants. The first claim is brought on behalf of Lieut. Donohue's Estate, pursuant to the Fourteenth Amendment, for the violation of Lieut. Donohue's substantive due process rights. Plaintiffs argue that Defendants "created a danger for Scott by refusing to adopt and implement policies to combat the stigma attached to police officer mental health treatment." *Id.* ¶ 142. Plaintiffs further assert that Defendants endangered Lieut. Donohue by confining him to his house for 40 hours per week over the course of seven years and refusing to accommodate him.[1] *Id.* ¶ 144. According to the Complaint, Defendants could have provided a light-duty position to Lieut. Donohue but chose not to. *Id.* ¶ 145. Moreover, Plaintiffs maintain that Defendants' requirement for Lieut. Donohue to remain in his home and VHPD's monitoring of his compliance with this policy acted as a restraint on his liberty such that Lieut. Donohue was in VHPD's custody. *Id.* ¶ 146. With regard to Police Chief McGowan and Police Chief Wing specifically, Plaintiffs allege that they were the highest-ranking officials of the VHPD and in that capacity had the authority and ability to make decisions pertaining to the implementation of mental health programs. *Id.* ¶ 148. Moreover, since McGowan and Wing were the highest-ranking policy makers for the VHPD, Plaintiffs maintain that their actions and inactions can be

---

[1] Sometime in 2014 or 2015, Lieut. Donohue was disciplined for violating the restriction to residence policy by visiting his sick mother at the hospital. Compl. ¶¶ 95-96.

attributed to the Defendant Village. *Id.* ¶ 148. In the second cause of action, Plaintiffs allege a substantive due process claim on behalf of Mrs. Donohue. She avers that by virtue of Defendants' conduct toward Lieut. Donohue, they violated her right to intimate association with her husband. *Id.* ¶¶ 150-56.

### B. Procedural History

Plaintiffs commenced the instant action on June 28, 2017. *See* Compl. On July 17, 2017, Defendants filed a letter motion to Judge Azrack seeking a pre-motion conference for Defendants' anticipated motion to dismiss the Complaint. DE 12. Judge Azrack waived the pre-motion conference requirement and set a briefing schedule for the motion to dismiss which was filed on October 17, 2017. Electronic Order of July 25, 2017. On June 11, 2018, Judge Azrack referred Defendants' motion to dismiss to this Court for a Report and Recommendation as to whether the motion should be granted. Electronic Order of June 11, 20188.

### III. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the pleading as true and draw all reasonable inferences in favor of the non-movant. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *Reed v. Garden City Union Free School Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013) (quoting *Warney v. Monroe County*, 587 F.3d 113, 120 (2d Cir. 2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 127 S. Ct. 1955, 1959 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S. at 679. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*; *Brookfield Asset Mgmt., Inc. v. AIG Fin. Prods. Corp.*, No. 09-CV-8285, 2010 WL 3910590, at *4 (S.D.N.Y. Sept. 29, 2010) (quoting *Iqbal*, 129 S. Ct. at 1949) ("A complaint is inadequately pled 'if it tenders naked assertions' devoid of 'further factual enhancement.'"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In resolving a motion pursuant to Rule 12 of the Federal Rules of Civil Procedure, the Court generally "must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint 'relies heavily' and which are, thus, rendered 'integral' to the complaint." *Soller v. Boudreux*, No. 12-CV-0167, 2015 WL 500492, at *6 (E.D.N.Y. Feb. 3, 2015) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)) (citing *In re Thelen, LLP*,

736 F.3d 213, 218 (2d Cir. 2013)); *accord Lawrence v. Sharkey*, No. 13-CV-1743, 2015 WL

2213274, at *3 (E.D.N.Y. May 8, 2015).  However, Rule 12(d) provides that:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).[2]

## IV.   DISCUSSION

### A.   42 U.S.C. § 1983

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for alleged violations of the Due

Process Clause of the Fourteenth Amendment.  *See* Compl.   Section 1983 "is not itself a source

of substantive rights, but a method for vindicating federal rights elsewhere conferred by those

parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan,*

443 U.S. 137, 144 n. 3 (1979).  "For claims under section 1983, a plaintiff must prove that (1)

the challenged conduct was attributable at least in part to a person who was acting under color of

state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution

of the United States."  *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 316-17 (E.D.N.Y.

2014) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted)).   No one has

contested the fact that the Defendants were acting under color of state law.  And Plaintiffs have

---

[2]     Plaintiffs and Defendants have submitted to the Court Attorney affidavits pertaining to the issue of whether VHPD offered Lieut. Donohue a "light-duty" position. *See* Declaration of Matthew Weinick [DE 18]; *see also* Reply Affidavit of Richard Finkel ("Finkel Reply Aff.") [DE 20].  The communications submitted by Defendants, *see* Exhibits A-H attached to Finkel Reply Aff., cannot be considered by this Court in connection with the instant motion to dismiss since this information was not attached to the Complaint and was not otherwise incorporated by reference in the Complaint.  Moreover, the Court must accept the allegations set forth in the Complaint as true.

asserted that the conduct deprived Lieut. Donohue of rights guaranteed under the Constitution of the United States, namely, the asserted substantive due process claim under the Fourteenth Amendment.

### B. Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause has procedural and substantive components.  The latter, which is the subject of the instant case, "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1065, 117 L. Ed. 2d 261 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)); *see County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citing *Daniels*, 474 U.S. at 331, 106 S.Ct., at 665; *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)), *abrogated on unrelated grounds by Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *receded from Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) .  The clause "does not speak to a general right to protection from private harm."  *Campbell v. Brentwood Union Free Sch. Dist.*, 904 F. Supp. 2d 275, 279 (E.D.N.Y. 2012); *see DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989) (The clause does not guarantee "certain minimal levels of safety and security.").

Courts have found, however, that state officials may have a duty to protect an individual from violence in two "exceptional circumstances":  (1) where a "special relationship" exists between the state and an individual, or (2) where the state created or increased the danger to the

individual. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (citing

*DeShaney*, 489 U.S. at 195, 109 S.Ct. at 1002)); *see Robischung-Walsh v. Nassau Cty. Police

Dep't*, 421 Fed. App'x. 38, 40 (2d Cir. 2011) (summary order). In distinguishing the two

categories, the Second Circuit has held that "'special relationship' liability arises from the

relationship between the state and a particular victim, whereas 'state created danger' liability

arises from the relationship between the state and the private assailant." *Pena v. DePrisco*, 432

F.3d 98, 109 (2d Cir. 2005).

Even if the conduct being considered is deemed to fall within the scope of one of the two

"exceptional circumstances," the conduct must also be "so brutal and offensive to human dignity

that it shocks the conscience." *Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284,

295 (E.D.N.Y. 2004) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 & n. 6 (2d Cir. 1973),

*partially abrogated on other grounds by Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104

L.Ed.2d 443 (1989)) (internal quotation marks omitted). "[C]onduct intended to injure in some

way unjustifiable by any government interest is the sort of official action most likely to rise to

the conscience-shocking level." *Cty. of Sacramento*, 523 U.S. at 849, 118 S. Ct. at 1718 (citing

*Daniels*, 474 U.S. at 331, 106 S.Ct. at 665). Defendants here argue that the circumstance of this

case do not invoke either of the two exceptions set forth above. Nor does the alleged conduct

"shock the conscience." Therefore, Defendants maintain, the Complaint should be dismissed.

### 1. Special Relationship Exception

According to Supreme Court precedent, "when the State takes a person into its custody

and holds him there against his will, the Constitution imposes upon it a corresponding duty to

assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty.

Dep't of Soc. Servs.*, 489 U.S. 189, 199–200, 109 S. Ct. 998, 1005, 103 L. Ed. 2d 249 (1989)

(citing *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2458 (1982)). This reasoning is based on the fact that when an individual is in custody, he is unable to secure for himself "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200, 109 S. Ct. at 1005 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–104, 97 S.Ct. 285, 290–291 (1976); *Youngberg*, 457 U.S. at 315–316, 102 S.Ct. at 2457–2458).

Courts have found an affirmative duty of care arising from a special relationship in cases involving incarcerated persons, involuntarily committed mental patients, children in foster care and parolees. *See e.g.*, *Estelle*, 429 U.S. at 103-04, 97 S.Ct. at 290-91 (incarcerated prisoner); *Youngberg*, 457 U.S. 307, 102 S.Ct. 2452 (involuntarily committed mental patient); *Jacobs v. Ramirez*, 400 F.3d 105, 107 (2d Cir. 2005) (parolee); *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 194 (E.D.N.Y. 2014) (foster care). The instant case, however, involves none of these circumstances; rather, it arises from an employment relationship entered into freely by an adult and his employer.

In the context of the special relationship exception, courts have held that "consensual employment agreements do 'not entitle the employee to constitutional protection from workplace hazards' even if the government employee 'risk[s] losing her job if she did not submit to unsafe job conditions.'" *Cruz v. New York City Hous. Auth.*, No. 03 CIV. 8031, 2004 WL 1970143, at *8 (S.D.N.Y. Sept. 3, 2004) (quoting *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999)). The Second Circuit in *Robischung-Walsh v. Nassau Cty. Police Dep't*, 421 Fed. App'x. 38, 40 (2d Cir. 2011) (summary order) applied this principle in the law enforcement context, albeit in the form of a summary order. *Robischung-Walsh* involved an action brought by the widow of a Nassau County police detective who suffered from cumulative post-traumatic stress disorder ("CPTSD") and tragically committed suicide. *Id*. at 40. The widow alleged that the defendants

failed to properly train her husband and other officers on "suicide prevention, suicide risk assessment, or the effects of CPTSD." *Id*. The Second Circuit held that a special relationship did not exist between the detective and the Nassau County Police Department since the plaintiff had been voluntarily employed by the police department. *Id*. (quoting *Collins*, 503 U.S. at 128, 112 S. Ct. 1061). The court proceeded to explain that "[s]ubstantive due process does not support constitutional liability for claims based solely on a governmental entity's alleged failure 'to provide its employees with a safe working environment.'" *Id*. (quoting *Collins*, 503 U.S. at 126, 112 S.Ct. 1061).

Although *Robischung-Walsh* does not involve the restriction to residence policy asserted in the instant case, the Court finds that the same legal principle applies. By entering into an employment relationship with the Defendant Village, Lieut. Donohue agreed to be bound by the Police Department's employment policies. Plaintiff could have voluntarily left employment with the Defendant Village at any time -- a fact that is supported by the allegations of the Complaint itself. Plaintiff states that "Scott could have retired with a regular retirement." Compl. ¶ 102. The concern that doing so would have denied him favorable tax benefits and higher payments does not persuade the Court that Lieut. Donohue was in Defendants' "custody" in the same sense that an incarcerated person, parolee, child in foster care, or involuntarily committed mental health patient is in "custody." Likewise, Lieut. Donohue was also free to explore other avenues of employment, although the reluctance to do so in the face of the financial loss he would face is understandable.

The case law cited by Plaintiff does not persuade the Court to find otherwise. Plaintiff argues that "[c]ourts have left open the possibility that certain employment circumstances may create a sufficient restraint on liberty." Pl's. Opp'n. at 15. In support of this position, Plaintiff

cites the following language from *Cruz*: "the Second Circuit has thus far only recognized 'custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child" as imposing an affirmative duty to protect on state actors.'"  2004 WL 1970143, at *8 (citing *Ying Jing Gan*, 996 F.2d at 533; *White*, 183 F.3d at 1257).  Use of the phrase "thus far" does not give this Court license to expand the scope of the "special relationship" exception -- and therefore the protections afforded under substantive due process -- into areas in which the Second Circuit and Supreme Court have yet to rule.  *See Collins*, 503 U.S. at 125, 112 S. Ct. at 1068 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–226, 106 S.Ct. 507, 513–514, 88 L.Ed.2d 523 (1985)) ("As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

Plaintiff also relies on *Dwen v. Barry*, 483 F.2d 1126, 1130 (2d Cir. 1973), a case in which the Second Circuit held that "choice of personal appearance is an ingredient of an individual's personal liberty, and that any restriction on that right must be justified by a legitimate state interest reasonably related to the regulation."  However, *Dwen* does not involve a state's duty to protect an individual from private violence and is therefore inapposite.  Moreover, the Court finds that Plaintiff's reliance on *Morrow v. Balaski*, 719 F.3d 160, 170 (3d Cir. 2013), as amended (June 14, 2013), and *Torisky v. Schweiker*, 446 F.3d 438, 441 (3d Cir. 2006) actually undermines Plaintiff's position.  *Torisky* involved a suit brought by the guardians of 20 adults who resided at Western Center, a state operated mental health facility.  *Torisky*, 446 F.3d at 441. The facility closed and residents were transferred to privately owned facilities.  *Id*.  During the course of the transfer, state police created a "physical blockade…to separate plaintiffs from their

parents, guardians, relatives and other loved ones." *Id*. Residents were ordered onto buses/vans and driven to facilities several hours away. *Id*. The court in *Torisky* ultimately determined that a custodial relationship had not existed since the plaintiffs voluntarily submitted to state custody. *Id*. at 446 (citing *Zinermon v. Burch*, 494 U.S. 113, 117–18 n. 3, 131 n.17, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Monahan v. Dorchester Counseling Ctr., Inc*., 961 F.2d 987, 991 (1st Cir. 1992); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995)).

In *Morrow v. Balaski*, two high school students and their parents brought suit against the school district and their school's assistant principal alleging the defendants violated the students' substantive due process rights by failing to protect them from harm inflicted by a fellow student. *Morrow*, 719 F.3d at 163. Even in view of "compulsory school attendance laws and the concomitant *in loco parentis* authority and discretion that schools necessarily exercise over students," the court held that a special relationship did not exist between the student plaintiffs and their school. *Id*. at 171 (citing *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992)). The facts of *Morrow* and *Torisky* make an even more compelling case for a finding of a "custodial relationship" than those presented here, yet the respective courts held that no special relationship existed.

Based on the above analysis, the Court finds that the circumstances of the instant case do not warrant application of the special relationship exception. Thus, the Court turns to the state created danger exception.

### 2. *State Created Danger Exception*

The state created danger exception is invoked where "a government official takes an *affirmative act* that creates an opportunity for a third party to harm a victim (or increases the risk of such harm)." *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007) (citing *Pena*, 432 F.3d at

108; *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998); *Dwares v. City of New York*, 985 F.2d 94, 98-99 (2d Cir. 1993), *overruling on unrelated grounds recognized by Montero v. City of Yonkers, New York*, 890 F. 3d 386 (2d Cir. 2018).  For insight into the type of conduct which falls within the scope of the "state created danger" exception, the Court turns to *Dwares v. City of New York*.  The plaintiff in *Dwares* participated in a political rally in Washington Square Park which involved the burning of an American flag.  *Dwares*, 985 F.2d at 108.  The plaintiff alleged that he had been assaulted by "skinheads" as a result of his participation in the event.  *Id*. at 100.  He further claimed that the defendant police officers notified the "skinheads" that the officers would not interfere with the skinheads' assault of demonstrators and would not arrest those responsible for the assaults.  *Id*.  The Second Circuit held that the plaintiff had adequately alleged a "state created danger" since his complaint "went well beyond allegations that the defendant officers merely stood by and did nothing."  *Id*. at 99.  In fact, the Second Circuit noted, the defendant officers "had made the demonstrators more vulnerable to assaults."  *Id*.  *Dwares* is distinct from the instant case in that it involved the encouragement of private violence which made the demonstrators more susceptible to injury -- circumstances that simply do not exist here. The court in *Robischung-Walsh v. Nassau County Police Department* reached the same conclusion.  421 Fed. App'x. at 41.  In addition to holding that the special relationship exception was inapplicable, the Second Circuit also declined to apply the state created danger doctrine since the plaintiff failed to set forth allegations of "affirmative, risk-creating acts by the defendants."  *Id*.

The Court finds unavailing Plaintiffs' citations to *Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016), *Eddy v. Virgin Islands Water & Power Auth*., 955 F. Supp. 468, 471 (D.V.I.), *reversed in nonrelevant part on reconsideration*, 961 F. Supp. 113 (D.V.I. 1997), and *Briscoe v.*

*Potter*, 355 F. Supp. 2d 30, 32 (D.D.C. 2004). The courts in these cases found that substantive due process had been triggered, notwithstanding their findings as to qualified immunity. Further, the courts pointed out that each case involved workplace injuries and situations in which the employer unquestionably took affirmative acts that put the plaintiff in a "worse position than that in which he would have been had [the state] not acted at all." *See Pauluk*, 836 F.3d at 1124 (quoting *Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006)). For example, in *Pauluk*, the plaintiff was involuntary transferred to a facility that was infested with toxic mold. *Id*. at 1119. The court stated that the harm was foreseeable since the plaintiff entreated the authorities that he not be transferred to that particular facility for fear that he would become ill from the mold. *Id*. at 1125. Moreover, the court noted the plaintiffs presented evidence that individual defendants "actively tried to conceal the amount of, and danger posed by, the mold." *Id*. In view of these facts, the court determined that a reasonable jury could find that the defendants acted with deliberate indifference toward the danger posed by the toxic mold. *Id*.

In *Eddy v. Virgin Islands Water & Power Auth.*, a "switch" located in the vicinity of high voltage power lines required changing. 955 F. Supp. at 471. The defendant employer determined that this would be done while the switch was energized with over 14,000 volts of electricity. *Id*. The supervisor of electricians refused to permit any of his workers to attempt the dangerous task and advised that the procedure was unsafe. *Id*. The plaintiff was subsequently ordered to complete the work, even though he was not qualified or trained to do so and the defendant knew the plaintiff would almost certainly be at risk of severe bodily injury. *Id*. The defendants advised plaintiff that if he refused, he would be subject to disciplinary action. *Id*.

The plaintiff was severely injured when 14,000 volts traveled into his body in the process of attempting to complete the task as ordered. *Id*.

Lastly, in *Briscoe v. Potter*, 355 F. Supp. 2d 30, 38 (D.D.C. 2004), the defendant employer, the United States Postal Service, assured its employees that its Brentwood facility was safe even though the defendant knew it was contaminated with anthrax. The court determined that the allegations invoked the "state endangerment theory" of liability. All of the foregoing cases involve affirmative acts which subjected the plaintiff to considerable danger -- danger that the plaintiff would not have otherwise been exposed to had the employer not acted. In the instant case, although Plaintiff characterizes Defendants' conduct as affirmative -- the affirmative decision not to implement policies to facilitate mental health treatment and to alleviate the stigma surrounding such treatment, Defendants' conduct is more akin to passive inaction since Plaintiffs allege Defendants failed to implement certain policies that would reduce the risk of suicide.

Plaintiffs also attempt to analogize the instant case to *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990). *Freeman* arose from the murder of a woman and her daughter by the woman's estranged husband. *Id*. The defendant police officer was close friends with the husband and had encouraged other law enforcement officers not to address the woman's pleas for help to enforce a restraining order which restrained the husband from "harassing, coming about, intimidating, bothering or in any manner interfering" with the woman. *Id*. The action was filed prior to *DeShaney*, but the district court's decision dismissing the case was issued the day after *DeShaney* was decided. *Id*. at 54. The Eighth Circuit in *Freeman* held that the plaintiff should be given an opportunity to replead her complaint in an effort to satisfy the standard set forth in *DeShaney*. Meeting that standard would involve more specifically articulating how the defendant police chief's actions affirmatively placed the decedents "in a more vulnerable

position." *Id*. at 55. The facts of *Freeman* are quite distinguishable from the instant case and do not lend support to Plaintiffs' position. In *Freeman*, officers had initially attempted to stop the husband's conduct, which was violative of a restraining order, but were specifically told not to do so because of the husband's relationship with the police chief. *Id*. at 54. This conduct is substantially more akin to the type of "affirmative conduct" which triggers substantive due process than the inaction alleged in the instant case. Moreover, the Eighth Circuit went so far as to indicate that inclusion of the purported conduct in the complaint may not even satisfy the *DeShaney* standard. *Id*. at 55.

Based on this analysis is, the Court finds that the circumstances of this case do not trigger the state created danger exception.

### 3. "Conscience Shocking" Behavior

Even if it were determined that application of the "state created danger" exception or "special relationship" exception is warranted, the state conduct must also "shock the contemporary conscience" in order to trigger substantive due process. *Lombardi*, 485 F.3d at 79 (quoting *Pena*, 432 F.3d at 112). Whether conduct shocks the conscience is determined by the "state of mind of the government actor and the context in which the action was taken." *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (citing *County of Sacramento*, 523 U.S. at 845, 118 S.Ct. 1708). The determination requires "'an exact analysis of the circumstances' in deference to the consistently limited nature of substantive due process rights."[3] *Case v.*

_____

[3] As *Case v. Anderson* shows, such a determination can be made in the context of a motion to dismiss. Likewise, in *Cusick v. City of New Haven*, 145 Fed. App'x. 701 (2d Cir. 2005) (summary order), the Court of Appeals considered whether the alleged conduct at issue constituted "the kind of heinous behavior recognized in the law as 'conscience-shocking'" and upheld the district court's decision granting the motion to dismiss. And in *Lombardi v. Whitman,* 485 F.3d 73 at 85 (2d Cir. 2007), the Second Circuit affirmed the district court's decision on a

*Anderson*, No. 16 CIV. 983, 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

Negligence does not give rise to a substantive due process claim. However, conduct that is intended to cause harm to an individual may give rise to such a claim. *Id.* (quoting *County of Sacramento*, 523 U.S. at 849, 118 S.Ct. 1708). "Between intentionally and negligently inflicted harm lies injury caused through a defendant's deliberate indifference, a state of mind that, akin to recklessness, requires that a defendant knew of the risk and deliberately assumed or disregarded it." *Correction Officers' Benevolent Ass'n, Inc. v. City of New York*, No. 17 CV 2899, 2018 WL 2435178, at *3 (S.D.N.Y. May 30, 2018) (citing *Pena*, 432 F.3d at 114; *Matican v. City of New York*, 524 F.3d 151, 158 (2d Cir. 2008)); *see Cty. of Sacramento*, 523 U.S. at 834, 118 S. Ct. at 1711 (citing *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), *abrogated on unrelated grounds by Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291)). In *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005), the Second Circuit pointed out that "deliberate indifference" can support such a claim "where the government owes a special duty of care to those in its charge." *O'Connor*, 426 F.3d at 203 (citing *County of Sacramento*, 523 U.S. at 849-50, 118 S.Ct. 1708.); *see Correction Officers' Benevolent Ass'n, Inc.*, 2018 WL 2435178, at *4 (quoting *Cnty, of Sacramento*, 523 U.S. at 853) (citing *Lombardi*, 485 F.3d at 83; *Pena*, 432 F.3d at 112-14) (deliberate indifference socks the conscience where "government actor created or increased the danger to an individual and had sufficient 'time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of

---

motion to dismiss finding that the official's alleged deliberate indifference did not rise to conscience-shocking level.

competing obligations' or public goals.").  Moreover, "liability cannot be imposed under the deliberate indifference standard when a governmental entity acts subject to the pull of competing governmental obligations."  *Correction Officers' Benevolent Ass'n, Inc*., 2018 WL 2435178, at *4 (citing *Lombardi* 48 F.3d at 85); *see Collins*, 503 U.S. at 116, 112 S. Ct. at 1064; *see also Golian v. New York City Admin. for Children Servs*., 282 F. Supp. 3d 718, 732 (S.D.N.Y. 2017) (citing *Matican*, 524 F.3d at 159).

Here, Plaintiffs do not allege that Defendants acted with the intent to cause Lieut. Donohue physical injury.  *See TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 751 (S.D.N.Y. 2011), *aff'd*, 503 Fed. App'x. 82 (2d Cir. 2012).  With regard to deliberate indifference, the Court has already determined that there was no custodial relationship between Lieut. Donohue and Defendants.  Moreover, the decision whether to offer programs to combat the stigma of mental health treatment and to encourage such treatment requires consideration of competing obligations, namely, the safety of officers and the allocation of scarce resources -- factors which also weigh against a finding of deliberate indifference.  Notably, Plaintiffs have not pointed to a single case involving a police officer suicide where the court held that the defendants' conduct "shocked the conscience."  This Court's own independent research did not uncover such a case either, but rather led the Court back to *Robischung-Walsh v. Nassau Cty. Police Dep't*.  In response to the plaintiff's argument that the defendants' conduct rose to the level of "conscience shocking," the *Robischung-Walsh* court held that "allegations of deficiencies in the department's [CPTSD and suicide prevention] training program do not describe government behavior that is 'arbitrary, conscience-shocking, or oppressive in a constitutional sense.'"  421 Fed. App'x. At 41 (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)).

For the foregoing reasons, even if this case triggered either the special relationship or state created danger exceptions, the Court finds that the conduct would not trigger substantive due process since the conduct does not shock the conscience.

### C. Mrs. Donohue's Substantive Due Process Claim

Plaintiffs contend that by failing Lieut. Donohue, Defendants violated Mrs. Donohue's right to intimate association with her husband. "The right to intimate association 'guarantees an individual the choice of entering into an intimate relationship free from undue intrusion by the state.'" *Uwadiegwu v. Dep't of Soc. Servs. of the Cty. of Suffolk*, 91 F. Supp. 3d 391, 397 (E.D.N.Y. 2015) (quoting *Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997), *aff'd*, 639 Fed. App'x. 13 (2d Cir. 2016). To the extent Mrs. Donohue is asserting her sindividual cause of action as a derivative claim, that claim fails because derivative claims are "not cognizable under § 1983 since such claims do not involve 'an injury based on a deprivation of the plaintiff's rights, privileges, and immunities.'" *Campos v. Weissman*, No. 9:07-CV-1263, 2009 WL 7771872, at *5 (N.D.N.Y. Sept. 10, 2009) (quoting *Shenk v. Cattaraugus County*, 2007 WL 2874427, at *6 (W.D.N.Y. Sept. 27, 2007), *aff'd*, 305 Fed. App'x. 751 (2d Cir. 2009)), *report and recommendation adopted*, No. 9:07-CV-1263, 2011 WL 1204839 (N.D.N.Y. Mar. 29, 2011); *see Grenier v. City of W. Haven*, No. 3:11 CV 808, 2012 WL 4092587, at *3 (D. Conn. Sept. 17, 2012) (determining that the plaintiff's right of intimate association claim failed). The Supreme Court, however, has recognized an independent right to intimate association, *see generally Roberts v. United States Jaycees*, 468 U.S. 609, 617–20, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), which includes a family's right "to remain together without the coercive interference of the awesome power of the state." *Morales v. City of New York*, 59 F.

Supp. 3d 573, 579 (S.D.N.Y. 2014) (citing *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999)) (internal quotation marks omitted).

Defendants argue that in order for Mrs. Donohue to plead a claim for violation of her right to intimate association, she must allege that the "defendant[s] engaged in conduct intended to interfere with family relations."  Defs.' Mem. at 15 (citing *Jones v. Cnty. of Suffolk*, 164 F. Supp. 3d 388, 399 (E.D.N.Y. 2016)).  The Second Circuit, however, has been reluctant to institute such a requirement.  *See Patel v. Searles*, 305 F.3d 130, 137 (2d Cir. 2002) (citing *Adler v. Pataki*, 185 F.3d 35, 43-44 (2d Cir. 1999)) ("First, this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association.").  In *Sharpe v. City of New York*, 560 Fed. App'x. 78, 79 (2d Cir. 2014) (summary order), for example, the Second Circuit noted that the district court dismissed the plaintiff's claim because the plaintiff failed to allege an intent to interfere in his relationship with his father. The Second Circuit proceeded to explain that "[w]e have previously recognized, however, that a plaintiff may state a claim for interference with an intimate association even though the complaint does not allege that the state either 'purported to regulate' the relationship or 'endeavored to end a ... relationship already begun.'"  *Id.* (citing *Adler*, 185 F.3d at 44). Notwithstanding the Second Circuit's articulation, district courts continue to require plaintiffs to allege that the defendant intended to interfere with the familial relationship at issue.  *See e.g., Amaker v. Schiraldi*, No. 15CV4879, 2017 WL 4402443, at *13 (E.D.N.Y. Sept. 29, 2017) (citing *Sharpe*, 560 Fed. App'x. 78); *Gorman v. Rensselaer Cty.*, No. 114 CV 0434, 2017 WL 1133392, at *12 (N.D.N.Y. Mar. 24, 2017).  Here, Mrs. Donohue does not allege that Defendants intended to interfere with her relationship with Lieut. Donohue.  The Court recognizes the ambiguity surrounding the issue whether Mrs. Donohue's claim fails on these grounds.

However, alternative grounds exist which require dismissal of Mrs. Donohue's claim in any event.

Similar to a substantive due process claim under § 1983, conduct which violates an individual's right to intimate association must also be "shocking, arbitrary, and egregious." *Morales*, 59 F. Supp. 3d at 579 (quoting *Tenenbaum*, 193 F.3d at 600). Here, the Court has already determined that as to Lieut. Donohue's claim, Defendants' cause of action does not state conduct which "shocks the conscience" as that standard is articulated in the Second Circuit. *See supra*. Plaintiffs have not cited a single case here which persuades the Court to find otherwise with regard to Mrs. Donohue's claim. Therefore, the Court finds that Plaintiffs have not stated a claim for violation of Mrs. Donohue's right to intimate association.

### D. Qualified Immunity

Because the Court is recommending to Judge Azrack that the substantive due process claims be dismissed, generally there would be no need to address the qualified immunity defense. However, in the event Judge Azrack disagrees, the Court here briefly addresses this defense.

"Qualified immunity shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). With regard to Mrs. Donohue's substantive due process claim, "[t]he Second Circuit's declination to rule on the issue [of whether an intent to interfere is required] [ ] indicates the murkiness of the law regarding the level of intent necessary to find a deprivation of the right to familial association." *McCants v. City of Newburgh*, No. 14 CV 556, 2014 WL 6645987, at *3

(S.D.N.Y. Nov. 21, 2014), *clarified on denial of reconsideration*, No. 14 CV 556, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014). Therefore, it cannot be said that Chief Wing and Chief McGowan violated "*clearly established* statutory or constitutional rights of which a reasonable person would have known." *Id*. (emphasis added); *Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *16 (S.D.N.Y. Mar. 29, 2018) (citing *Ryburn v. Huff*, 565 U.S. 469, 474 (2012)) (determining that "the Court [could not] say that conduct not intentionally directed at the familial relationship was clearly unlawful"). Consequently, even if the Court determined that Defendants Wing and McGowan had violated Mrs. Donohue's substantive due process rights, they would still be entitled to qualified immunity in connection with her claims. Moreover, the Court finds that Defendants Wing and McGowan would also be entitled to qualified immunity on the claims brought on behalf of the Estate since, as discussed in Section IV.A., the failure to implement policies to combat the stigma associated with seeking mental health treatment and policies that help prevent suicide does not violate a clearly established constitutional right.

### E. Claim Against the Village of Hempstead

Since the Plaintiffs have failed to state violations of constitutional rights, Plaintiffs' *Monell* claim against the Village of Hempstead must be dismissed. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").

### F. As to Defendant Chief Wing and the Statute of Limitations

According to the Complaint, Chief Wing left the employ of the Village of Hempstead in January 2012. Compl. ¶ 9. Section 1983 has a three-year statute of limitations. *See Wallace v.*

*Kato*, 549 U.S. 384, 387, 127 S. Ct. 1091, 1093, 166 L. Ed. 2d 973 (2007) (citing *Owens v. Okure*, 488 U.S. 235, 249–250, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia*, 471 U.S. 261, 279–280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), *superseded by 28 U.S.C. § 1658 on unrelated grounds*); *see also Baker v. New York City*, 934 F. Supp. 533, 535 (E.D.N.Y. 1996) (citing N.Y. Civ. Prac. Law § 214(5); *Zuccaro v. New York City Dep't of Transportation*, No. 94-5080, 1995 WL 264120 (E.D.N.Y. Apr. 28, 1995), *aff'd*, 99 F.3d 402 (2d Cir. 1995); *Malley v. Fernandez*, No. 91-5635, 1992 WL 204359 (S.D.N.Y. 1992)). Claims under Section 1983 accrue once the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (quoting *Singleton v. New York*, 632 F.2d 185, 191 (2d Cir. 1980)). "[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act becomes painful." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (quoting *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981)). Therefore, contrary to Plaintiffs' assertion, any potential cause of action under § 1983 against Chief Wing accrued prior to September 12, 2016. Since this Court has already determined that Plaintiff has failed to state a substantive due process claim, it finds that engaging in an analysis pertaining to the timeliness of any such claim is not necessary. For this same reason, the Court declines to consider whether Plaintiffs have adequately alleged the personal involvement of Defendant Wing.

### G.    Official Capacity Claims

Defendants argue that Plaintiffs' claims against the individual defendants in their official capacity must be dismissed as duplicative of Plaintiffs' claims against the Village of Hempstead. In the Opposition to the motion, Plaintiffs' counsel agrees that the claims are duplicative and consents to withdrawing them. As such, no further analysis is required concerning the official

capacity claims and the Court recommends to Judge Azrack that these claims be dismissed.

## H. Other Considerations

A claim that Defendants violated Lieut. Donohue's substantive due process right to be protected from private violence is distinct from a challenge to the constitutionality of the "restriction to residence" policy or the purported policy of not offering "light-duty" positions to injured officers. Plaintiffs do not seek a declaration that these policies are unconstitutional. Moreover, Plaintiffs' argument is not couched in terms of "rational relationship," or "legitimate government interests." *See generally Korenyi v. Dep't of Sanitation of City of New York*, 699 F. Supp. 388, 392-393 (E.D.N.Y. 1988) (applying "rational relationship" standard to challenge to sick leave policy except where challenge is premised on First Amendment); *Capasso v. Metro. Transp. Auth. of State of N.Y.*, 198 F. Supp. 2d 452, 460 (S.D.N.Y. 2002) (quoting *Monahan v. City of New York Dep't of Correction*, 10 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) ("because of the multitude of legitimate interests that a government has in regulating conduct of its own agents and employees, the facial constitutionality of municipal regulations relating to municipal employees is usually satisfied if the municipal government can show a rational relationship between the challenged regulation and the state interest it is claimed to foster."), *aff'd sub nom. Monahan v. New York City Dep't of Corr.*, 214 F.3d 275 (2d Cir. 2000)); *Voorhees v. Shull*, 686 F. Supp. 389, 393 (E.D.N.Y. 1987) (citing *Kelley v. Johnson*, 425 U.S. 238, 245, 96 S.Ct. 1440, 1444–45, 47 L.Ed.2d 708 (1976); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Philadelphia Lodge No. 5, Fraternal Order of Police v. City of Philadelphia*, 599 F. Supp. 254, at 257 (E.D. Pa. 1984), *aff'd sub nom. Local 22, Int'l Ass'n of Firefighters, AFL-CIO v. City of Philadelphia*, 779 F.2d 43 (3d Cir. 1985); *Loughran v. Codd*, 432 F. Supp. 259, 263 (E.D.N.Y. 1976)) ("The Supreme Court has indicated that the State as

employer has an interest which differs significantly from its interest in regulating the citizenry in general, and that when a State acts as an employer the courts should evaluate those actions under a more deferential standard than strict scrutiny.").

Moreover, Defendants point to an opinion in which the Supreme Court of the State of New York, County of Nassau, considered the constitutionality of a "stay at home" provision set forth in a Collective Bargaining Agreement ("CBA") between the Village of Hempstead Police Department and the Hempstead Police Benevolent Association. *Matter of Murphy v. Hall*, No. 7-16254, 2008 N.Y. Misc. LEXIS 8789 (Sup. Ct. March 11, 2008). The subject CBA covered the period from June 1, 2002 through May 31, 2007 so that agreement was not in effect at the time Lieut. Donohue was placed on leave. According to the *Murphy* opinion, however, the policy required those on sick leave to stay at home 24-hours a day except when permission to deviate from the policy was granted by the Chief or Watch Commander. *Id*. The petitioners in *Matter of Murphy* argued that the sick leave policy "was made in violation of lawful procedure, was affected by an error of law, was arbitrary and capricious, and an abuse of discretion." *Id*. at *2. On these grounds, the petitioners sought a declaration that the policy was unconstitutional. *Id*. The court ultimately held that while "stringent," the policy was rationally related to legitimate interests of the Police Department, namely, ensuring individuals do not partake in activity that would undermine his or her expeditious return to service, "departmental efficiency" and promoting the fair distribution of the departmental workload. *Id*. *3-*4. The court did explain, however, that where no guidelines exist with respect to determining whether an exemption to the "stay at home policy" is applicable -- and therefore absolute discretion is utilized -- "that absolute discretion carries with it the potential for arbitration application." *Id*. at

*6 (citing *Voorhees*, 686 F Supp. at 394; *Uryevick v Rozzi,* 751 F. Supp. 1064, 1068 (E.D.N.Y. 1990)).

## V.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends to Judge Azrack that Defendants' motion to dismiss the Complaint be GRANTED.

## VI.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See* Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joan M. Azrack, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Azrack prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *see also Johnson v. Woods*, 426 F. App'x .10, 11 (2d Cir. 2011) (citing *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)) ("A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding pro se, waives any challenge to the report on appeal."); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 n.2 (2d Cir. 1983)).


                                                    **SO ORDERED:**

Dated: Central Islip, New York
        August 17, 2018


                                                    /s/ A. Kathleen Tomlinson
                                                    A. KATHLEEN TOMLINSON
                                                    U.S. Magistrate Judge